UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

**James Stalmer,**   Civil No. 06-4563 (MJD/SRN)

    **Plaintiff,**

    v.   **REPORT AND RECOMMENDATION**

**Michael J. Astrue,**
**Commissioner of Social Security,**

    **Defendant.**

---

    Ethel J. Schaen, Schaen Law Office, 1821 University Avenue, Suite 344, St. Paul, Minnesota 55104; and Thomas A. Krause, 701 34th Place, West Des Moines, Iowa 50265; on behalf of Plaintiff

    Lonnie F. Bryan, Office of the United States Attorney, 300 South Fourth Street, Suite 600, Minneapolis, Minnesota 55415, on behalf of Defendant

---

SUSAN RICHARD NELSON, United States Magistrate Judge

    Pursuant to 42 U.S.C. § 405(g), Plaintiff James Stalmer seeks judicial review of the final decision of the Commissioner of Social Security ("Commissioner"), who determined that Plaintiff became disabled on February 2, 2006, but was not disabled prior to that date. Both parties have filed motions for summary judgment, and the motions have been referred to the undersigned United States Magistrate Judge for a Report and Recommendation pursuant to 28 U.S.C. § 636(b)(1) and District of Minnesota Local Rule 72.1. For the reasons set forth below, the Court recommends that Plaintiff's Motion for Summary Judgment be denied and Defendant's Motion for Summary Judgment be granted.

I.  **BACKGROUND**

    A.  **Procedural History**

Plaintiff filed for supplemental security income on August 26, 2003, and for disability insurance benefits on October 10, 2003. (Admin. R. at 59-61.) He alleged a disability onset date of December 16, 2002, due to a fractured heel. (Id. at 33, 81, 88.) His disability insured status expired on March 31, 2004.

Plaintiff's applications were denied initially and on reconsideration. (Id. at 32-33, 35-36, 45.) Plaintiff appealed and requested a hearing, which was held on January 10, 2006, before Administrative Law Judge (ALJ) William Brown. (Id. at 280.) The ALJ issued a partially favorable decision on May 22, 2006, finding Plaintiff disabled as of February 2, 2006, but not before that date. (Id. at 17.) The ALJ also found that Plaintiff was not under a disability at any time through March 31, 2004, the date he was last insured. (Id.) Plaintiff filed a request for review with the Appeals Council, which denied the request. (Id. at 7, 11.) The ALJ's decision therefore became the final decision of the Commissioner.

Plaintiff filed a complaint in federal court on November 20, 2006, and a motion for summary judgment on March 28, 2007. In the motion, he argues that the ALJ failed to adopt the testimony of the medical expert, Dr. Paul Gannon, that Plaintiff met or equaled several listed impairments. If the Court finds that Plaintiff was disabled between December 2002 and August 2005, he asks the Court to find that he was entitled to a "disability freeze," extending his date last insured to March 31, 2006. Defendant responds in his motion for summary judgment that substantial evidence supports the ALJ's decision because Plaintiff's treating physicians opined that Plaintiff could perform at least sedentary work throughout the relevant time period, except

when he was recovering from his various surgeries. Therefore, according to Defendant, Plaintiff was not disabled at any time prior to February 2, 2006, and he is not entitled to an extension of his date last insured.

### B. Factual Background

Plaintiff fractured his left heel on December 16, 2002, when he fled from police and jumped from a balcony. (Admin. R. at 136, 137, 288.) Plaintiff testified at the administrative hearing that his ankle hurt when he walked more than six blocks or stood longer than five or ten minutes. (Id. at 291, 294.) Other than his heel injury, Plaintiff also claimed to have knee and shoulder problems. (Id. at 290.) He stated that he could not lift more than five pounds, bend, or sit for more than fifteen minutes without changing positions. (Id. at 294, 298.) He used a cane to help him walk and wore a knee brace. (Id. at 296-97.)

During the day, Plaintiff read books and the newspaper, watched television, and played video games with his son. (Id. at 291.) He cleaned and maintained his apartment by himself, cooked with a microwave, and washed the dishes. (Id. at 291-92.) Plaintiff did not drive because his license was revoked for driving under the influence. (Id. at 286.) Plaintiff testified that he last worked in August 2002 as a construction worker and cement laborer. (Id. at 287.)

### C. Medical Evidence in the Record

Plaintiff did not receive medical treatment for his fractured heel for several months following the injury because he was incarcerated. (Id. at 153, 173-74.) When he was released from prison, he began treatment with Dr. Peter Cole. (Id. at 173.) On September 9, 2003, Dr. Cole noted that Plaintiff had severe pain in his left ankle and heel, which caused him to limp. (Id. at 174.) Dr. Cole thought that Plaintiff could generally bear his own weight, as tolerated,

and advised Plaintiff to take ibuprofen with his meals. (Id.)

On October 7, 2003, Dr. Cole opined that Plaintiff could perform limited employment with the following restrictions: seated work only, no stair or ladder climbing, minimal walking, no prolonged standing, and no squatting. (Id. at 147-48.) On October 13, 2003, Plaintiff told Dr. Cole that his left heel pain was an eight on a ten-point scale. (Id. at 170.) A CAT scan revealed a markedly deformed heel bone, and Dr. Cole recommended surgery. (Id. at 169-70, 172.) Dr. Cole performed the surgery on November 6, 2003. (Id. at 161, 167.)

Plaintiff saw physician's assistant Trent Whitcomb on November 25, 2003, and reported doing quite well and requiring no pain medication. (Id. at 163.) The same day, Plaintiff told Dr. Cole that his pain was a six on a ten-point scale. (Id. at 165.)

On December 3, 2003, Dr. Cole opined that Plaintiff would be able to perform limited employment in about four more weeks. (Id. at 143.) Dr. Cole expected that Plaintiff would be able to work eight hours a day, but only seated work until Dr. Cole reevaluated him. (Id. at 143.)

Dr. Cole completed a medical opinion form on January 19, 2004, noting that Plaintiff would be able to resume working after his next surgery. (Id. at 141.) He did not make any specific medical findings on the form. On January 20, 2004, Dr. Cole saw Plaintiff for a follow-up appointment to the November surgery. (Id. at 161.) Plaintiff reported that although his pain had not improved, his ability to flex and extend his toes had improved. (Id.) On further questioning from the doctor, Plaintiff admitted that his pain had decreased, but expressed disappointment that he could not walk for a long time or for long distances without swelling and pain. (Id. at 160-61.) Dr. Cole scheduled a talocalcaneal fusion surgery to aid in the reconstruction of Plaintiff's foot and ankle. (Id. at 160.) Plaintiff also reported pain in his right

4

knee, for which Dr. Cole recommended strengthening exercises. (Id.)

On January 29, 2004, Dr. Cole completed a report of work ability, indicating that Plaintiff could return to work with the following restrictions: lifting no more than twenty pounds, pushing or pulling no more than twenty pounds, changing posture as needed, minimal walking, no prolonged standing, and no squatting. (Id. at 138.)

Dr. Cole performed a semi-elective fusion on Plaintiff's left foot on March 2, 2004, placing two surgical screws through his heel bone. (Id. at 156-57.) Mr. Whitcomb noted two weeks later that Plaintiff's pain was well-controlled and Plaintiff had no complaints. (Id. at 152-53.)

A medical consultant evaluated Plaintiff's residual functional capacity (RFC) in March 2004. (Id. at 187-94.) He found Plaintiff to have the following exertional limitations: lifting or carrying no more than ten pounds occasionally; lifting or carrying no more than ten pounds frequently; standing or walking at least two hours in an eight-hour workday; sitting about six hours in an eight-hour workday; limited pushing or pulling with his lower extremities; using a cane for ambulation; and limited pedaling with his left foot. (Id. at 188.) He also found that Plaintiff could not climb on a ladder or scaffold and that Plaintiff could not work safely in a hazardous environment. (Id. at 189, 191.)

On June 2, 2004, Plaintiff saw Dr. Cole for his left ankle pain. (Id. at 231.) He described the pain as aching and, at times, sharp, but only a five on a ten-point scale. (Id.) Dr. Cole noted that the fusion was well-healed and not tender, and he advised Plaintiff to increase weight-bearing activities as tolerated. (Id. at 232.) Dr. Cole thought that Plaintiff should wean himself from using crutches or a Cam walker. (Id.) A few weeks later, Plaintiff saw Dr. Ralph Bovard

5

for right knee pain. (Id. at 227.) He told Dr. Bovard that he felt pain when he played hockey and softball. (Id. at 227-28.)

Plaintiff sought treatment for his right knee pain again on August 3, 2004. (Id. at 223.) Dr. Thomas Lange noted excellent range of motion despite a deformity of the knee. (Id. at 224.) He referred Plaintiff to Dr. Gregory Brown to discuss treatment options. (Id.)

In August 2004, Plaintiff saw Mr. Whitcomb for pain in his left ankle. (Id. at 218.) Plaintiff reported that he could walk for about three blocks before experiencing pain. (Id.) Mr. Whitcomb told Plaintiff he would probably always feel some amount of pain due to the extent of his injury and the delay in having it treated. (Id.) Plaintiff had no other complaints, and he demonstrated good motion, flexibility, and extension of his toes. (Id.) A few days later, an x-ray revealed that Plaintiff had a degenerative arthritic change in his ankle due to the fixation screw, but that the fusion was solid. (Id. at 221.)

In September 2004, Plaintiff saw Dr. Brown for treatment of his right knee pain. (Id. at 215.) Dr. Brown noted that Plaintiff's medical records indicated severe osteoarthritis. (Id.) Dr. Brown recommended treatment with a knee brace. (Id. at 216.) Plaintiff returned to Dr. Brown on October 26, 2004. (Id. at 210.) Dr. Brown observed that Plaintiff had a deformity of the knee but that he had full extension and flexion to at least 120 degrees. (Id.) Dr. Brown thought Plaintiff would be a good candidate for a total knee arthroplasty or a high tibial osteotomy. (Id.)

On November 24, 2004, Plaintiff saw Dr. Cole to obtain more pain medication. (Id. at 207.) However, Plaintiff admitted that his ankle and foot did not bother him most of the time. (Id.) Upon examination, Dr. Cole noted no soreness along the incision and no prominence along the hardware in the heel area. (Id. at 208.) Dr. Cole prescribed Ultracet, but warned Plaintiff

that long-term narcotic use was not a treatment option.  (Id.)

Dr. Brown performed an arthroscopy on Plaintiff's right knee on December 20, 2004, and recommended that Plaintiff not work until further notice.  (Id. at 240-41.)  During a follow-up appointment in January 2005, Dr. Brown suggested a right high tibial osteotomy (id. at 264), and he performed this operation on February 8, 2005 (id. at 243).  During a post-surgical appointment on April 19, 2005, Plaintiff told Dr. Brown that he was doing very well, could partially bear his weight with the aid of a "crutch walker," and experienced "very minimal" pain.  (Id. at 250.)

Plaintiff was discharged from physical therapy on April 21, 2005, for failing to attend recommended follow-up treatments.  (Id. at 254.)  The physical therapist noted that Plaintiff had been making progress.  (Id.)

Approximately six months after the osteotomy, in August 2005, Dr. Brown wrote that Plaintiff's knee was "doing quite well."  (Id. at 246.)  Dr. Brown opined that the osteotomy was successful and noted that Plaintiff had resumed working in construction.  (Id.)  Dr. Brown released Plaintiff to "activities as tolerated" and suggested that Plaintiff wear a brace during heavy activities.  (Id.)

Plaintiff fell on December 25, 2005, injuring his shoulder and knee.  (Id. at 275.)  On December 29, 2005, Plaintiff had an MRI of his knee, which showed advanced degenerative joint disease with cartilage loss and cyst formation.  (Id. at 211.)  Results also showed a complete disruption of the anterior cruciate ligament with no intact ligamentous fibers, although the lack of any edema indicated that the injury was chronic.  (Id.)  After considering Plaintiff's previous knee condition and surgeries, the interpreting radiologist, Dr. Jeffrey Fete, concluded that there

was "no definite evidence for an acute internal derangement or occult fracture." (Id. at 212.)

On January 4, 2006, Plaintiff saw Michael Damato, a physical therapist at Summit Orthopedics, Ltd., for treatment of his shoulder and knee injuries resulting from his fall two weeks before. (Id. at 275.) A physical examination revealed normal alignment, no specific tenderness, and a good range of motion in the right knee. (Id.) An x-ray of Plaintiff's shoulder, however, revealed "a grade 3 AC separation," which Mr. Damato concluded was the source of Plaintiff's symptoms. (Id.) Mr. Damato opined that Plaintiff would be unable to work from January 4, 2006, to February 1, 2006, due to his shoulder injury. (Id. at 268, 276.)

Dr. Patricia Stewart evaluated Plaintiff's left ankle pain on January 6, 2006. (Id. at 277.) Plaintiff described his ankle as painful and weak, and rated his pain as a five on a ten-point scale. (Id.) He also described his left foot as "loose" and "flopping," particularly when he climbed stairs. (Id.) Dr. Stewart found minimal weakness, mildly decreased strength, and a fairly normal range of motion, despite a significant ankle deformity. (Id. at 278.) Dr. Stewart recommended physical therapy as treatment. (Id.)

### D. Evidence from the Medical Expert

Dr. Gannon testified at the administrative hearing that Plaintiff met Listing 1.03[1] as of December 16, 2002, because of an inability to ambulate effectively. (Id. at 298-99.) When the ALJ asked Dr. Gannon to identify the medical evidence supporting that opinion, Dr. Gannon testified that Plaintiff's shoulder injury, combined with the need to use his other extremity for his cane, meant that Plaintiff could not ambulate effectively. (Id. at 300-01.) The ALJ pointed out

---

[1] Listing 1.03 describes a musculoskeletal impairment due to surgery on a major weight-bearing joint, which has caused an inability to ambulate effectively for at least twelve months. 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 1.03.

8

that Plaintiff's shoulder injury did not occur until December 2005. (Id. at 301.)

Dr. Gannon then testified that Listing 1.06[2] applied to Plaintiff, reasoning that the addition of Listing 1.06 to Listing 1.03 would equal Listing 1.03. (Id. at 301-02.) He also testified that adding Listing 1.08[3] to Listing 1.03 and Listing 1.06 would equal Listing 1.03. (Id. at 303.)

When the ALJ asked Dr. Gannon to assume that Plaintiff did not meet or equal Listing 1.03, Dr. Gannon assigned the following functional limitations to Plaintiff: performing less than sedentary work; walking or standing less than two hours in an eight-hour workday; minimal stooping; good use of only the right upper extremity, but not the left; lifting less than ten pounds; no climbing ramps, stairs, ropes, or scaffolds; no balancing, stooping, kneeling, crouching, or crawling; requiring a sit-or-stand option; manipulative limitations for only the right upper extremity, but not the left; and avoiding wetness and cold. (Id. at 302.) Removing the left shoulder injury from consideration, Dr. Gannon thought that Plaintiff could lift ten pounds both occasionally and frequently. (Id. at 302-03.)

### E.   Evidence from the Vocational Expert

The ALJ asked the vocational expert, David Russell, to consider an individual with Plaintiff's education and work experience, impaired by a heel fracture, right knee pain, disorders of the spine, and depression with mild limitations of activities of daily living and moderate

---

[2] Listing 1.06 describes a musculoskeletal impairment due to a bone fracture, which has caused an inability to ambulate effectively for at least twelve months. 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 1.06.

[3] Listing 1.08 describes a musculoskeletal impairment due to a soft tissue injury, under continuing surgical management directed toward restoration of a major function, which was not restored within twelve months. 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 1.08.

limitations of expected social functioning, but able to perform sedentary work. (Id. at 305.) The ALJ defined sedentary work as lifting a maximum of ten pounds occasionally and five pounds frequently; standing or walking two hours in an eight-hour workday; and sitting six hours in an eight-hour workday. (Id.) The ALJ also added restrictions of occasional stooping and crouching; no kneeling, crawling, climbing, or working at heights or around hazardous machinery; no operating of foot controls with the left foot; an ability to concentrate, understand, and remember routine instructions; an ability to carry out routine repetitive tasks; an ability to interact with coworkers and the public on a brief and superficial basis; and an ability to cope with ordinary levels of supervision and to tolerate routine stressors of a work setting. (Id.) Mr. Russell testified that such an individual could not perform Plaintiff's past work but could work in numerous production, assembly, and hand trimming jobs. (Id.)

    F.    **The ALJ's Decision**

The ALJ began his decision by noting that Plaintiff met the insured status requirements for entitlement to benefits from the alleged onset of disability date of December 16, 2002 through March 31, 2004, which meant that Plaintiff had to establish a disability during that time period in order to receive benefits. (Id. at 16.) The ALJ then engaged in the required five-step sequential evaluation: (1) whether the claimant is engaged in substantial gainful activity; (2) whether the claimant has a severe impairment; (3) whether the claimant's impairment meets or equals an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1; (4) whether the claimant is capable of returning to past work; and (5) whether the claimant can do other work existing in significant numbers in the regional or national economy. See 20 C.F.R. § 404.1520(a)-(f).

The ALJ found that Plaintiff had not engaged in substantial gainful activity since his alleged onset of disability date. (Admin. R. at 18.) The ALJ next found that Plaintiff was severely impaired by a calcaneus fracture, status-post right heel osteotomy, right knee osteoarthritis; depression; anxiety; alcohol and cocaine dependence; and a history of amphetamine abuse. (Id.) The ALJ rejected Dr. Gannon's opinion that Plaintiff's impairments met Listing 1.03 because the opinion was based on the premise that Plaintiff's upper extremity was immobilized, which did not actually occur until December 25, 2005, well after the alleged onset of disability, and indeed, after Plaintiff's disability insured status expired. (Id. at 18-19.) The ALJ also rejected Dr. Gannon's opinion that Plaintiff met Listings 1.06 and 1.08 because the record failed to show a twelve-month period during which Plaintiff could not effectively ambulate or work. (Id. at 19, 22.) Thus, the ALJ concluded that Plaintiff's impairments did not meet or equal an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1.

At step four, the ALJ found that prior to February 2, 2006, Plaintiff had the RFC for three- to four-step, unskilled, sedentary tasks; an ability to handle ordinary supervision and routine stress; an ability to occasionally stoop and crouch; an inability to kneel, crawl, or climb ropes or heights; an inability to work around hazards such as moving machinery; an inability to work with pedals or foot controls with his left foot; and limited to brief and superficial contact with others. (Id. at 22.) With this RFC, the ALJ concluded that Plaintiff could have performed a significant number of jobs in the national economy prior to February 2, 2006, and thus, Plaintiff was not disabled before this date. (Id. at 25-26.) Moreover, although Plaintiff became disabled as of his fiftieth birthday in February 2006 under Medical-Vocational Rule 201.14, he was not entitled to disability benefits because that date fell after the date he was last insured. (Id. at 26.)

Plaintiff was granted supplemental security income benefits. (Id. at 28.)

## II. STANDARD OF REVIEW

Congress has prescribed the standards by which Social Security disability benefits may be awarded. "The Social Security program provides benefits to people who are aged, blind, or who suffer from a physical or mental disability." Locher v. Sullivan, 968 F.2d 725, 727 (8th Cir. 1992). "Disability" under the Social Security Act is the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment." 42 U.S.C. § 423(d)(1)(A). The claimant's impairments must be "of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." Id. § 423(d)(2)(A). The impairment must have lasted or be expected to last for a continuous period of at least twelve months, or be expected to result in death. Id. § 423(d)(1)(A).

### A. Administrative Review

If a claimant's initial application for benefits is denied, he or she may request reconsideration of the decision. 20 C.F.R. § 404.909(a)(1). A claimant who is dissatisfied with the reconsidered decision may obtain administrative review by an ALJ. Id. § 404.929. If the claimant is dissatisfied with the ALJ's decision, he or she may request review by the Appeals Council, although review is not automatic. Id. §§ 404.967-.982. The decision of the Appeals Council, or of the ALJ if the request for review is denied, is final and binding upon the claimant unless the matter is appealed to a federal district court within sixty days after notice of the Appeals Council's action. 42 U.S.C. §§ 405(g), 1383(c)(3); 20 C.F.R. § 404.981.

B.    **Judicial Review**

Judicial review of the Commissioner's decision is limited to a determination of whether the decision is supported by substantial evidence in the record as a whole. Hutsell v. Sullivan, 892 F.2d 747, 748-49 (8th Cir. 1989). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Richardson v. Perales, 402 U.S. 389, 401 (1971). The review is "more than a mere search of the record for evidence supporting the [Commissioner's] finding." Brand v. Sec'y of Dep't of Health, Educ. & Welfare, 623 F.2d 523, 527 (8th Cir. 1980). Rather, "'the substantiality of evidence must take into account whatever in the record fairly detracts from its weight.'" Id. (quoting Universal Camera Corp. v. NLRB, 340 U.S. 474, 488 (1951)).

The reviewing court must review the record and consider:

1. The credibility findings made by the ALJ.
2. The plaintiff's vocational factors.
3. The medical evidence from treating and consulting physicians.
4. The plaintiff's subjective complaints relating to exertional and non-exertional activities and impairments.
5. Any corroboration by third parties of the plaintiff's impairments.
6. The testimony of vocational experts when required which is based upon a proper hypothetical question which sets forth the claimant's impairments.

Cruse v. Bowen, 867 F.2d 1183, 1184-85 (8th Cir. 1989) (citing Brand, 623 F.2d at 527). A court may not reverse the Commissioner's decision simply because substantial evidence would support an opposite conclusion, Baker v. Heckler, 730 F.2d 1147, 1150 (8th Cir. 1984), and in reviewing the record for substantial evidence, the Court may not substitute its own judgment or findings of fact, Woolf v. Shalala, 3 F.3d 1210, 1213 (8th Cir. 1993). Instead, the court must

consider "the weight of the evidence in the record and apply a balancing test to evidence which is contradictory." Gavin v. Heckler, 811 F.2d 1195, 1199 (8th Cir. 1987). If it is possible to draw two inconsistent positions from the evidence and one of those positions represents the Commissioner's decision, the court must affirm that decision. Robinson v. Sullivan, 956 F.2d 836, 838 (8th Cir. 1992).

## III. DISCUSSION

### A. Whether the ALJ Failed to Give Due Weight to the Testimony of Dr. Gannon

Plaintiff contends that the ALJ erred by not adopting Dr. Gannon's opinion that Plaintiff was impaired under Listing 1.03 and Listing 1.06.[4] Listing 1.03 describes a musculoskeletal impairment resulting from "reconstructive surgery or surgical arthrodesis of a major weight-bearing joint, with inability to ambulate effectively, as defined in 1.00B2b, and return to effective ambulation did not occur, or is not expected to occur, within 12 months of onset." 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 1.03. Listing 1.00B2b defines effective ambulation:

> (1) Definition. Inability to ambulate effectively means an extreme limitation of the ability to walk; i.e., an impairment(s) that interferes very seriously with the individual's ability to independently initiate, sustain, or complete activities. Ineffective ambulation is defined generally as having insufficient lower extremity functioning . . . to permit independent ambulation without the use of a hand-held assistive device(s) that limits the functioning of both upper extremities. . . .
>
> (2) To ambulate effectively, individuals must be capable of sustaining a reasonable walking pace over a sufficient distance to be able to carry out activities of daily living. They must have the ability to travel without companion assistance to and from a place of employment or school. Therefore, examples of ineffective ambulation include, but are not limited to, the inability to walk without the use of a walker, two crutches or two canes, the inability to walk a block at a reasonable pace on rough or uneven surfaces, the inability to use standard public

---

[4] Plaintiff does not argue that he meets or equals Listing 1.08, which describes soft tissue injuries, despite Dr. Gannon's testimony that the listing applied to Plaintiff.

>   transportation, the inability to carry out routine ambulatory activities, such as shopping and banking, and the inability to climb a few steps at a reasonable pace with the use of a single hand rail. The ability to walk independently about one's home without the use of assistive devices does not, in and of itself, constitute effective ambulation.

Id. § 1.00B2b.

Listing 1.06 pertains to an impairment resulting from a fracture of the femur, tibia, pelvis, or one or more of the tarsal bones, and requires both "[s]olid union not evident on appropriate medically acceptable imaging and not clinically solid" and an "[i]nability to ambulate effectively, as defined in 1.00B2b, and return to effective ambulation did not occur or is not expected to occur within 12 months of onset." Id. § 1.06.

In this case, the key factor of both Listing 1.03 and Listing 1.06 is that the inability to ambulate must have lasted, or be expected to last, for at least twelve months. However, none of Plaintiff's treating physicians expressed an expectation that Plaintiff would be unable to effectively ambulate for at least twelve months. Furthermore, there was no twelve-month period during which Plaintiff was unable to ambulate effectively, as defined by Listing 1.00B2b. For nine months after his December 2002 injury, while he was incarcerated, Plaintiff received no medical treatment for his ankle injury. At the time he began treatment with Dr. Cole, he was not using any hand-held assistive device to walk, and there is no evidence that he could not walk a block at a reasonable pace, use public transportation, perform routine activities such as shopping and banking, or climb a few steps. Indeed, Dr. Cole's treatment notes show that Plaintiff was bearing his own weight as he could tolerate and was performing normal daily activities. In October 2003, Dr. Cole permitted Plaintiff to return to work as long as Plaintiff was limited to seated work with no climbing, minimal walking, no prolonged standing, and no squatting.

Obviously, Dr. Cole thought that Plaintiff had the ability to travel without companion assistance to and from a place of employment, which is antithetical to an inability to ambulate effectively under Listing 1.00B2b.  Dr. Cole imposed no other restrictions on Plaintiff's activities.

The treatment records from Plaintiff's physicians consistently reveal that only temporary inabilities to ambulate occurred after each of his four surgeries, and that after each surgery, he quickly recovered and regained his ability to walk and perform other activities, including work. For example, only a few weeks after his ankle surgery in November 2003, Plaintiff told Mr. Whitcomb that he was doing quite well and required no pain medication.  One month after the ankle surgery, Dr. Cole noted that Plaintiff would be able to resume seated employment in about a month, but that even the seated requirement would be subject to further evaluation.  In January 2004, Plaintiff told Dr. Cole that his pain had decreased, and that he could not walk for long periods of time or long distances without pain.  When Plaintiff complained of knee pain at this visit, Dr. Cole recommended only strengthening exercises.  Dr. Cole also completed another return-to-work form, indicating that Plaintiff could lift, carry, push, and pull up to twenty pounds; walk at a minimal level; stand and squat for short periods of time; and change posture as needed.  At this point, Plaintiff's ability to walk after the November 2003 surgery had improved beyond the limitations in Listing 1.00B2b.  Plaintiff's ability to walk worsened only after he had a second, semi-elective surgery on his ankle in March 2004.  Two weeks after the March 2004 surgery, Plaintiff had no complaints and was taking only Tylenol for pain, although he was not yet bearing his own weight.  By June 2004, Dr. Cole advised Plaintiff to increase his weight-bearing and wean himself from the crutches and Cam walker.

Later that month, Plaintiff told Dr. Bovard that he was experiencing knee pain when he

played hockey and softball. Plaintiff's self-report of playing sports was certainly inconsistent with an inability to ambulate as described in Listing 1.00B2b. The same is true for Plaintiff's statement to Mr. Whitcomb in August 2004 that he could walk three blocks before feeling pain in his ankle. A few months later, in November 2004, Plaintiff told Dr. Cole that his ankle and foot did not bother him most of the time.

Plaintiff had an arthroscopy on his right knee in December 2004 and a right high tibial osteotomy in February 2005. Two months after the osteotomy, Plaintiff told Dr. Brown that he was doing very well, had minimal pain, and was partially bearing his own weight. Dr. Brown told Plaintiff to begin bearing his full weight in a few weeks. In August 2005, Plaintiff reported only occasional pain and said he had been doing some construction work. Dr. Brown recommended that Plaintiff wear a brace for heavy activities but released him to perform activities as tolerated. Dr. Brown did not suggest that Plaintiff was extremely limited in his ability to walk, that he would need a hand-held assistive device to walk, or that he would be unable to carry out activities of daily living such as traveling to his job, shopping, or banking.

In light of all of the evidence from Plaintiff's treating physicians pertaining to Plaintiff's ability to walk, the ALJ was certainly entitled to reject Dr. Gannon's opinion that Plaintiff's impairments met or equaled Listing 1.03 or Listing 1.06 because of an inability to ambulate effectively. See 20 C.F.R. § 404.1527(d) (explaining that, generally, more weight will be given to treating and examining sources; sources that have a lengthy and in-depth treatment relationship with the claimant; and sources who provide medical support for their opinion). Not only did Dr. Gannon have no treatment relationship with Plaintiff, but there was no medical evidence to support his opinion. Thus, the ALJ appropriately rejected it.

Moreover, when the ALJ pressed Dr. Gannon for support in the record for his opinion, Dr. Gannon testified that Plaintiff's shoulder injury, combined with the need to use his other extremity for his cane, meant that Plaintiff could not ambulate effectively.  The ALJ was entitled to reject this opinion because any inability to ambulate due to the shoulder injury, which occurred in December 2005, occurred long after both the alleged onset of disability date and the expiration of his disability insured status.

Finally, the issue of whether an impairment or combination of impairments meets or equals a listing is a question reserved solely for the ALJ to make.  Id. § 404.1527(e)(2).  Thus, contrary to Plaintiff's position, Dr. Gannon's testimony did not create a "presumption" that Plaintiff's impairments met a listed impairment.

### B.     Whether Plaintiff Was Entitled to a "Disability Freeze," Extending His Date Last Insured to March 31, 2006

Plaintiff argues that if the Court finds he was entitled to a period of disability between December 2002 and August 2005, those months may be excluded in determining whether he was fully or currently insured.  However, because Plaintiff failed to establish a period of disability during that time frame, he is not entitled to an exclusion of time or extension of his date last insured.

Based on the foregoing, and all the files, records, and proceedings herein, **IT IS HEREBY RECOMMENDED** that:

1.     Plaintiff's Motion for Summary Judgment (Doc. No. 13) be **DENIED**; and

  2.  Defendant's Motion for Summary Judgment (Doc. No. 16) be **GRANTED**.


Dated: January 17, 2008

                   s/ Susan Richard Nelson
                   SUSAN RICHARD NELSON
                   United States Magistrate Judge


Under D. Minn. LR 72.2(b), any party may object to this Report and Recommendation by filing with the Clerk of Court, and serving all parties by **February 1, 2008**, a writing which specifically identifies those portions of this Report to which objections are made and the basis of those objections. Failure to comply with this procedure may operate as a forfeiture of the objecting party's right to seek review in the Court of Appeals. A party may respond to the objecting party's brief within ten days after service thereof. A judge shall make a de novo determination of those portions to which objection is made. This Report and Recommendation does not constitute an order or judgment of the District Court, and it is therefore not appealable to the Court of Appeals.